**Sallee R. BRUHWILER,**
**Plaintiff–Appellee,**

v.

**UNIVERSITY OF TENNESSEE and Dr.**
**D.T. Stafford, Defendants–Appellants.**

**No. 87–6220.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 23, 1988.

Decided Oct. 18, 1988.

Rehearing and Rehearing En Banc
Denied Dec. 1, 1988.

Beauchamp E. Brogan, The University of Tennessee, Ronald C. Leadbetter (argued), Knoxville, Tenn., JoAnn C. Cutting, The University of Tennessee, Memphis, Memphis, Tenn., for defendants-appellants.

Richard B. Fields, Kathleen L. Caldwell (argued), Memphis, Tenn., for plaintiff-appellee.

Before MARTIN and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Defendants Dr. D.T. Stafford and the University of Tennessee appeal the district court's judgment for Sallee R. Bruhwiler in this sexual discrimination case.

In April 1973, Bruhwiler, a white female, was hired as a research toxicologist at the University of Tennessee's Toxicology Laboratory in Memphis. At this time, she was working on a master's degree in experimental pathology at the University. Her evaluations indicated that she was a satisfactory employee. In June 1977, Stafford, director of the laboratory, asked Bruhwiler to assume the responsibilities of chief toxicologist, the person in charge of running the entire laboratory. Nevertheless, she was not officially promoted and she was not offered a salary increase. At this time,

the laboratory was significantly under-staffed. In September 1977, Bruhwiler informed Stafford that she was unable to perform the duties of chief toxicologist. Stafford responded, "Couldn't handle it, huh?"

After Bruhwiler resigned from her "unofficial promotion" to chief toxicologist, two white males, Albert Phillips and Harold Nichols, were hired as research toxicologists and trained by Bruhwiler. In 1979, at the urging of Stafford, Bruhwiler took a one-year leave of absence to do research for her master's degree. Shortly after Bruhwiler took her leave, Stafford promoted Phillips and Nichols to supervisory positions. In 1979, Scott Fernandez, another white male, was hired as a research toxicologist and trained by Bruhwiler. In 1981, Fernandez, the laboratory employee with the least seniority and experience, was promoted to a supervisory position. At this time, the laboratory was allegedly organized into four sections, each with a supervisor. The supervisors were three white males and Ann Fowler. This organizational scheme notwithstanding, Fowler, who had a much longer tenure in the laboratory than any of her male peers, was not officially classified as a supervisor and received a much lower salary than the male supervisors.

On April 16 and June 3, 1982, Bruhwiler filed administrative grievances protesting the promotion of the less experienced male supervisors. The University's administrative dean rejected her grievances without holding a hearing. On May 4, 1982, Stafford called Bruhwiler into his office and gave her the names and phone numbers of places to contact about getting a job, even though Bruhwiler had never asked Stafford for help in obtaining employment elsewhere. On June 21, 1982, Bruhwiler received her first "less than satisfactory" evaluation from Stafford. Bruhwiler resigned effective September 6, 1982.

Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., Bruhwiler brought a civil suit against Stafford and the University alleging discriminatory non-promotion and constructive dis-charge. Bruhwiler requested back pay and attorneys' fees, but not reinstatement. Following a bench trial, the district court found in favor of Bruhwiler on both counts.

On the issue of non-promotion, the district court found that Bruhwiler set out a prima facie case of sex discrimination as required by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As a legitimate, non-discriminatory reason for Bruhwiler's non-promotion, the defendants stated that Bruhwiler was not promoted because she was unable to get along well with her fellow employees. The district court found that this proffered reason was pretextual and that Bruhwiler had demonstrated by a preponderance of the evidence that she was a victim of sex discrimination. In support of this finding, the district court specifically noted Bruhwiler was "extremely qualified" to be a supervisor, that she had in fact trained each of the male supervisors, and that several former laboratory employees testified Bruhwiler was not difficult to work with. Moreover, the district court found that Stafford's testimony to the contrary was not credible.

The district court also found in favor of Bruhwiler on the constructive discharge claim because Bruhwiler established that a reasonable person in her shoes would have felt compelled to resign. Here, the district court noted a pattern of sexual harassment by Stafford, Bruhwiler's inability to obtain administrative relief, and Stafford's May 1982 suggestion that Bruhwiler look for work elsewhere. The district court awarded Bruhwiler $29,000 in back pay, $9,480 in attorneys' fees, and $810 in costs and expenses.

The defendants now argue that the district court's findings that Bruhwiler was denied promotion on account of her sex and that she was constructively discharged were clearly erroneous.

The applicable standard of review has been fully set out by the Supreme Court. Because a finding of intentional discrimination is a finding of fact, the standard governing appellate review of a district court's finding of discrimination is that

set forth in Federal Rule of Civil Procedure 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." ... This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently....

....

When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.... [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson v. Bessemer City,* 470 U.S. 564, 573–575, 105 S.Ct. 1504, 1511–1512, 84 L.Ed.2d 518 (1985).

 Under this extremely narrow standard of review, we are unable to say that either of the challenged findings are clear error. As for the discriminatory non-promotion claim, the district court applied appropriately strict scrutiny to the defendants proffered reason for Bruhwiler's non-promotion. As we have noted previously, "the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority." *Grano v. Dept. of Development of City of Columbus,* 699 F.2d 836, 837 (6th Cir.1983). The district court plausibly found that Bruhwiler was fully qualified and that the defendant's proffered reason for non-promotion was pretext for discriminatory action. Consequently, the district court's finding of discriminatory non-promotion cannot be set aside.

 The law in this circuit is clear that a constructive discharge exists if working conditions are such that a reasonable person in the plaintiff's shoes would feel compelled to resign. *Henry v. Lennox Industries, Inc.,* 768 F.2d 746, 752 (6th Cir.1985). Again, the district court plausibly found that, in addition to being subjected to continuing discrimination, Bruhwiler was "required to train the person who would supervise her," *Id.* at 751, was given a poor evaluation because of her complaints and, ultimately, was effectively told to find another job. Accordingly, the district court's finding of a constructive discharge was not clearly erroneous.

The judgment of the district court is affirmed.

DAVID A. NELSON, Circuit Judge, dissenting.

If Congress had authorized the federal courts to assess damages against universities for "clumsy managem⸱⸱ " the $40,000 judgment that was entⸯᷓd against the University of Tennessee iₙ this case would seem unexceptionable. But Congress did not give the courts that sweeping a warrant. What Congress actually said, rather, was that it would be unlawful for an employer

"to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, *sex,* or national origin." 42 U.S.C. § 2000e–2(a)(1). (Emphasis supplied.)

The district court felt very strongly that Mrs. Bruhwiler had been treated shabbily by Dr. Stafford. I have no quarrel with that judgment. On the record before us, however, I see no basis on which the district court could properly have concluded that Mrs. Bruhwiler was "discriminate[d] against ... because of [her] ... sex...." Try to stretch it as you will, the cloth of which this particular suit is made cannot be stretched to fit the pattern laid down by Congress, in my opinion.

As a preliminary matter, it is worth noting that the record contains not so much as a hint of any "sexual harassment." No one in the laboratory ever spoke disparagingly or disrespectfully of women, as far as the testimony shows. There was no evidence that the atmosphere in the work place was sexually charged in any way. There was no evidence of any sexually suggestive talk or conduct on the part of Dr. Stafford or anyone else connected with the laboratory. The district court did say, in describing Mrs. Bruhwiler's testimony, that she "explained the harassment she received from Dr. Stafford," but "harassment" was Mrs. Bruhwiler's term, and in announcing his ruling from the bench the district judge explicitly said "I don't believe there was anything sexual or immoral about it." We see a fair number of sexual harassment cases in this court, and Mrs. Bruhwiler's clearly is not one of them.

If Mrs. Bruhwiler felt "harassed" by Dr. Stafford, it was not because Dr. Stafford was some sort of lecher but because, as the judge commented from the bench, Dr. Stafford was "proud and arrogant," prone to "errors of judgment," lacking in "concern for his people," and "incompetent" as an administrator. None of this has anything to do with Mrs. Bruhwiler's sex, as far as I can see, except insofar as the judge may have considered Dr. Stafford guilty of a certain lack of gallantry—of failing to pay *enough* attention to the plaintiff's sex.

An interesting indication of the trial judge's *Weltanschauung* may be found in his rather heated reaction to Mrs. Bruhwiler's testimony about an incident that occurred soon after Scott Fernandez was made her supervisor. Mr. Fernandez normally arrived at work before Mrs. Bruhwiler did, "and every morning when I came in," as she testified, "he had started samples for me to analyze." This bothered Mrs. Bruhwiler, and she told Mr. Fernandez he shouldn't do that. Fernandez thereupon got Dr. Stafford, and, Mrs. Bruhwiler told the court, the following interchange occurred:

"He said what the hell is this goddamn noise about you and drug screens. And I said Dr. Stafford, if we're going to have this kind of confrontation I think we should have it in the privacy of your office. And so he said all right, and so he and Scott and I went to his office and he repeated it, he said why are you making all this damn noise about this. And I said please don't yell at me. And he said you haven't heard any yelling yet. And he and Mr. Fernandez were both shaking, visibly shaking.

And at that point—well, we discussed it, and he told me I would do exactly as Mr. Fernandez told me, that Mr. Fernandez was my supervisor, and I would not make decisions on my own, that Mr. Fernandez would make all the decisions relative to drug screens.

And at that time I told him what he was doing was illegal, he could not run this like a personal business, and he said this is my laboratory and I will do anything I want to.

And at that point I left."

During final argument the district judge repeatedly called attention to this incident, accusing Dr. Stafford of "cursing out" Mrs. Bruhwiler. When defense counsel asserted that Dr. Stafford had tried to help her in various ways, the judge asked "What about cursing her out?" (Page 128, Vol. 2 of the transcript.) Defense counsel responded, "He didn't do that," to which the court replied, "He did. He certainly did." Referring, evidently, to Dr. Staf-

ford's use of the words "goddamn" and "hell," the court stated, at page 129, "I get to decide that I believe her and I get to observe in a civil case [and] ... he cursed her out. Now, that is a finding in this case." At page 130 the judge again repeated his characterization of Dr. Stafford's conduct: "I said he cursed her out." And, at page 139, after bringing the subject up again, the court said this:

> "Dr. Stafford came down there and cursed her out in the lab and then [went] upstairs and curse[d] her out again.
>
> MR. LEADBETTER: Well, Your Honor, I don't believe he cursed anyone out.
>
> MR. COURT: I have already told you how I found that. I get to try the case. I have listened to all the proof. The proof is in and he cursed her out."

Perhaps there was an era when no Southern gentleman would raise his voice to a lady and say to her, as Mrs. Bruhwiler testified Dr. Stafford did, "What the hell is this goddamn noise about you and drug screens," but Dr. Stafford was not a man of the cloth, and it is hard to believe that there was ever a time when he would have been faulted for addressing such language to another man. One can only conclude that Dr. Stafford's sin lay in his having forgotten that it was a lady he was talking to, and not a man. That may have been a breach of etiquette, even in this egalitarian and frequently profane age, but it was hardly evidence of a propensity to "discriminate against any individual ... because of such individual's ... sex...."

A much more significant manifestation of Dr. Stafford's lack of chivalry may be found in the "sink or swim" attitude he exhibited after promoting Mrs. Bruhwiler to the position of Chief Toxicologist in June of 1977. Although Mrs. Bruhwiler was not, I believe, in charge of running the entire laboratory—another woman, Ann Fowler, was put in charge of the serology section—Mrs. Bruhwiler was given heavy responsibilities during what must have been a very difficult period. Some 18 months earlier, Mrs. Bruhwiler was had gone through what she called an "extremely painful" separation from her husband of 15 years. She had five children to care for, the youngest of whom were twin 10–year-old boys. To earn additional money, Mrs. Bruhwiler was working two or three nights a week for Emergency Medical Services. Her promotion to Chief Toxicologist carried no immediate pay increase, because Dr. Stafford's invariable practice, when promoting from within, was to wait as long as nine months or more before attempting to get the bureaucracy to bestow a pay increase on the person—male or female—who had been promoted. The laboratory was short-handed in the summer of 1977, and several of the employees were relatively inexperienced. Dr. Stafford promised Mrs. Bruhwiler that he would help out personally in the lab, but he failed to keep his promise. Mrs. Bruhwiler, not surprisingly, found herself overwhelmed; after three months she resigned as Chief Toxicologist and returned to her job as Research Toxicologist. And all Dr. Stafford said, when she announced her resignation, was "Couldn't handle it, huh?"

That the district judge's blood should have boiled at this is entirely understandable. The judge's comment that Dr. Stafford "doesn't have concern for his people" could well be correct. Nor can I say that the district judge necessarily had it wrong when he said this of Dr. Stafford:

> "I have never seen anybody more incompetent to run a Toxicology Lab, based on what I have heard.[1] He ought to be fired, tomorrow. From competence [probably should be "For incompetence"], apart from the plaintiff's claim, he doesn't know what is going on over there."

The judge himself laid no claim to any academic qualifications in Dr. Stafford's area of expertise; the judge told Chief Serologist Paulette Sutton that "'[s]erology' ... is not a word I am familiar with," and he asked her how the word is spelled.

---

1. Elsewhere in his remarks from the bench, the judge said he did not believe that Dr. Stafford would even have known how to help Mrs. Bruhwiler in her laboratory work. In his oral ruling, however, the judge conceded that "[a]cademically, [Dr. Stafford] may have been qualified...."

But the plaintiff's claim, as the district court fully understood, was not that Dr. Stafford was uncaring, or arrogant, or ill informed about what was going on in his laboratory. The plaintiff's claim had to be that Dr. Stafford had discriminated against her because of her sex; Congress simply had not authorized the granting of monetary relief on any other basis. Sympathy for the plaintiff and distaste for the defendant are not the stuff of which a finding of sex discrimination can be made, of course, and probative evidence that Dr. Stafford discriminated against Mrs. Bruhwiler because of her sex is, in my opinion, virtually nonexistent.

The "most convincing proof that this man was against women," the district judge remarked, was his treatment of Ann Fowler. Yet in 1977—which was, as plaintiff testified, "the first time there had been internal promotions"—Dr. Stafford announced at a staff meeting that he was making not one internal promotion, but two. Both promotions involved women. One of those women was Ann Fowler.

Ms. Fowler was put in charge of the Forensic Serology laboratory, according to plaintiff's testimony. Ms. Fowler's successor as Chief Serologist—Paulette Sutton, herself a woman—testified that Ms. Fowler was still in charge of serology in 1979, when Messrs. Nichols and Phillips were promoted to comparable supervisory positions, and Ms. Sutton testified that Ms. Fowler remained in charge of serology until 1982, when she contracted an illness that was ultimately to result in her death. Ms. Sutton took over Ms. Fowler's supervisory responsibilities unofficially in 1982, and Ms. Sutton was formally promoted to section supervisor in January of 1984. (Five or six months later Ms. Sutton received a retroactive pay increase, just as one or more of the men had done after being officially promoted.)

At the time of her promotion in 1977, Ms. Fowler appears to have been receiving a salary higher than that received by anyone else in the laboratory except Dr. Stafford himself—and the following fiscal year (1978–79) Ms. Fowler was given a salary increase of 10%. It is true that for fiscal year 1980–81, Messrs. Phillips and Nichols —who had been "unofficially" promoted in 1979, when Mrs. Bruhwiler was off on a one-year leave of absence—were paid $1,023 more per annum than Ms. Fowler was. That differential was reduced to $673 in fiscal year 1981–82, however, and by the time of trial the Chief Serologist's pay was identical to the pay of the other supervisors.

The serology section's work was "totally different" from that of the rest of the lab, according to plaintiff herself, and when Paulette Sutton first came to work in the serology section, Ann Fowler told her "that our salaries were set according to [t]he pay scale in Knoxville as opposed to actually being set in Memphis." Dr. Stafford confirmed that the University treated serologists differently; "they were treated as medical technologists and their salaries were on a scale which was tied to or related to medical technologists' salaries at other laboratories at the University." If Dr. Stafford was lying about this, it should have been a simple matter to show it; yet his testimony on this point stands unimpeached. Dr. Stafford's treatment of Ann Fowler simply was not shown to have evidenced a disposition to engage in sex discrimination, in my view.

What the plaintiff herself felt was "grossly unfair," and what led her ultimately to file an administrative grievance against Dr. Stafford, were the personnel decisions described in plaintiff's grievance as follows:

"In early November, 1981, Dr. D.T. Stafford announced at a meeting of the Toxicology Laboratory that Mr. G.S. Fernandez would be Section Supervisor of the Drug Screen Section. I am the only other person working in that section and I have more experience, more education and more seniority than Mr. Fernandez. At that time, I asked Dr. Stafford how he could justify this move and he told me he could do it because he wanted to.

On March 26 of this year, I ascertained that A.M. Phillips, H.S. Nichols and Mr. Fernandez had officially been designated

Supervisors. At that time, I went to Dr. Stafford and asked him if he had considered me for the position of Supervisor. He said he had not. His reasons were that:

1. He did not feel I would be effective in the position because I did not get along with anyone, and
2. He had offered me this position in 1977 and I had declined it at that time."

It is undisputed that Mrs. Bruhwiler was well qualified technically to perform the job that Mr. Fernandez received, and it is undisputed that she had more seniority than Mr. Fernandez did. Mrs. Bruhwiler did not claim that Mr. Fernandez was not well qualified also, however, or that either of the other male supervisors was unqualified. Her testimony, rather, was as follows:

"These men are competent and they work hard, but they are no better than anybody else in the job.

And, you know, I had helped to train some of them, I had been in there longer and other people had been there as long or almost as long or equally as long."

Title VII does not require that promotions be made on the basis of seniority, however, and it does not require that promotions be made on the basis of sex. If the defendant can articulate a legitimate non-discriminatory reason for promoting the less-senior male in preference to the more-senior female, the defendant may not be held liable unless the plaintiff can sustain the burden of establishing that the stated reason was a pretext for discriminating against her because of her sex.

As far as the promotions of Messrs. Phillips and Nichols are concerned, Dr. Stafford testified that Mrs. Bruhwiler was on her year-long leave of absence at the time and thus was not even eligible for promotion. The district court made no finding that this explanation was a pretext for sex discrimination. As to Fernandez, a Spanish-surnamed male who assumed additional responsibilities in 1980 and received an "official" promotion in July of 1981, after Mrs. Bruhwiler's return to the lab, Dr. Stafford testified that when Mrs. Bruhwiler ques-

tioned him about the promotion he told her that

"The primary reason why I could not justify promoting her was the fact that she did not get along with other people, many other people in the laboratory very well. I was certain that if I had promoted her to a supervisory position I would have lost one individual immediately and two others as soon as they could of found jobs."

In its written findings and conclusions, the district court gave the following reasons (here quoted without the court's record citations) for concluding that Dr. Stafford's proffered reason was a pretext for sex discrimination:

"First, three former employees of the toxicology laboratory who worked at various intervals from 1974 to 1982 all testified of their ability to work well with Mrs. Bruhwiler and each of the male supervisors testified that Mrs. Bruhwiler helped train them, and in fact she tried to get one of them a raise when he was first hired.

Second, Dr. Stafford's testimony is not credible because his attitude toward female employees is overtly sexist. Although he testified that Mrs. Bruhwiler could not get along well with "other people" in the laboratory, in Exhibit 15 he evaluates Mrs. Bruhwiler as "Sallee many times seem to resent having to work with men. This affects her attitude and performance". To the contrary, Mrs. Bruhwiler helped train the men in the laboratory and neither Mr. Wiggins nor Mr. Vaughn, two disinterested former employees, had any problems with Mrs. Bruhwiler. The proof shows that Dr. Stafford treated his female employees discriminatorily. Besides cursing Mrs. Bruhwiler in front of other employees, his actions toward Mrs. Friderica Saharovici, a research toxicologist, were reprehensible. Mrs. Saharovici began work at the laboratory in 1972 after coming to Memphis from Romania. In July 1982, Dr. Stafford gave her an unsatisfactory evaluation and asked her to leave the university without any expla-

nation[.] Mrs. Saharovici was extremely upset over this action, yet Dr. Stafford never told her why this was done. Three months later her evaluation was changed to satisfactory.

Finally, the proof clearly supports a finding that the promotion of the three male employees to section supervisor was a ruse to increase their salaries. Mrs. Fowler, whom Dr. Stafford testified was also a supervisor, did not receive a commensurate increase in salary in spite of her lengthy tenure in the laboratory. This was the culminating insult to women in the laboratory, as Dr. Stafford continued his earlier discriminatory actions."

If this account is plausible in light of the record viewed in its entirety, as this court's quotation from *Anderson v. Bessemer City* shows, we may not reverse the district court's judgment even though convinced that we would have weighed the evidence differently had we been sitting as the trier of fact. I take the Supreme Court's injunction seriously, of course, and I have read every word of the trial transcript in this case. Having done so, I am bound to say that the district court's stated reasons for finding Mrs. Bruhwiler a victim of sex discrimination, as opposed to being on the wrong end of a personality clash and a victim of insensitivity or managerial incompetence, do not strike me as "plausible."

It is undisputed that from the time she started work in the laboratory in 1973 until at least 1977, Mrs. Bruhwiler did not particularly care for her supervisors. She said so herself: "I did not particularly care for the supervisors but I made every effort to get along with them." After alluding to the separation from her husband in November of 1975, she testified—with an obviously sincere display of emotion that cannot have failed to evoke the sympathy of the court—that "apparently I was difficult to get along with, although I did not realize it, nobody came and told me, nobody asked me if I was having any problems. And I overcame it after awhile."

To suppose that the plaintiff overcame her dislike of Dr. Stafford after her experience as Chief Toxicologist would be to attribute to her a measure of charity that few could aspire to, much less achieve. One of the plaintiff's own witnesses— David Wiggins, who worked part-time at the lab between 1978 and 1980—testified that Mrs. Bruhwiler "mentioned that [she and Dr. Stafford] didn't get along well...." Associate Dean Colson, who apparently interviewed both Mrs. Bruhwiler and Dr. Stafford as part of the adjudication of plaintiff's administrative grievance, commented to Mrs. Bruhwiler on "the obvious personal tension that exists within you and between you and Dr. Stafford."

If the district judge (a male) had found himself working in a small group with Dr. Stafford, one senses that there would have been an "obvious personal tension" between the two of them also. As the judge commented to defense counsel from the bench,

"Mr. Leadbetter, you have got a bunch of dodos to protect in this. Really, I don't understand. You know, you get some tough ones. The University of Tennessee, they have—that outfit— academia out there—they are the worst personnel managers I have ever seen in my life.

They really are. They are a bunch of silly children. They don't—they all are 'poppycock,' you know, proud and gossip and all that stuff. I have had several of these cases and everyone gets worse than the other."

If a male who considered Dr. Stafford a "dodo" had been passed over for promotion —and for all we know plaintiff's witness Edward Vaughn was passed over for precisely that reason—it would hardly have constituted sex discrimination. For Dr. Stafford to pass over a female whose own evidence showed she "didn't get along well" with him does not speak very well of Dr. Stafford's greatness of soul, perhaps, but surely a failure to promote because of a personality clash does not equate to discrimination because of *sex.*

The three former employees who testified as to their ability to work well with Mrs. Bruhwiler probably shared the latter's assessment of the lab's supervision. Mrs.

Sabatini, for example, testified that she "didn't always see eye-to-eye with the way Dr. Stafford did things," and she chose to leave the lab when offered a different job in the university. Mr. Vaughn, a toxicologist at the lab from 1977 to 1982, was senior to Mr. Fernandez and helped train him; Mr. Vaughn obviously resented the junior man's being promoted (it caused "a great deal of tension," Mr. Vaughn testified), and, like Mrs. Bruhwiler, he chose to leave. Unlike her, he did not choose to sue.

That there was tension between Mrs. Bruhwiler and the two male supervisors who were promoted before Mr. Fernandez seems undeniable. At least it was not denied; Mr. Phillips testified that during the time he was Mrs. Bruhwiler's supervisor they did not get along "real well," and Mrs. Bruhwiler made no showing to the contrary. Mr. Nichols testified—after removing his chewing gum, at the court's request —that although he didn't have any "run-ins" with Mrs. Bruhwiler, "conversation with her sometimes was kind of difficult...." Like Mr. Phillips, he testified that the people in the lab got along better after Mrs. Bruhwiler left.

Chief Serologist Paulette Sutton testified to the same effect:

"Q. Do you have any opinion as to whether or not she should have been promoted to that position?

A. I think Scott was probably more qualified.

Q. Do you have any doubts as to whether perhaps she should have been promoted instead?

A. No sir.

Q. Why not?

A. I personally like Sallee. I liked her then, I like her now. I don't really think she had the temperment [sic] to be a very good supervisor.

Q. Well, do you have any reason for saying that?

A. Well, there seemed to always be sort of an undertone of unhappiness with Sallee, unhappy with the job, unhappy with Dr. Stafford, unhappy with various people in the lab at different times. Some emotional outbursts even happened."

\* \* \* \* \* \*

"Q. Now, since Ms. Bruhwiler left the laboratory, has there been any change in the atmosphere as far as folks getting along?

A. I think we probably get along better now than in my ten years there. I think the whole operation is a lot smoother.

Q. Do you think that relates in any way to the fact that she has left, or is there some other reason?

A. I think things are real peaceful. I think Sallee kept things stirred up."

The district court's bench ruling and written findings and conclusions make no reference to Paulette Sutton's testimony.

What the court did say, in attempting to explain why he did not find Dr. Stafford's testimony credible, was that Dr. Stafford's "attitude toward female employees is overtly sexist." The sole support for this finding was Dr. Sutton's comment in Exhibit 15, a 1976 personnel evaluation, about Mrs. Bruhwiler's seeming "to resent having to work with men." The evaluation report in question—which antedated Mrs. Bruhwiler's promotion to Chief Toxicologist by a year—gave her an overall assessment of "satisfactory." The observation about her resenting to have to work with men, as Mrs. Bruhwiler testified, stemmed from a formal complaint that her male supervisor, Dr. Wayne Sickels, filed with Dr. Stafford after Mrs. Bruhwiler told Dr. Sickels that nobody was cleaning up the laboratory properly, and if he couldn't find anyone else to do it, he ought to do it himself. Not too long before this incident, a group that included Mrs. Bruhwiler had gone to Dr. Stafford and complained about Dr. Sickels' inadequacies as a supervisor. What the district court's opinion fails to mention, in discussing Dr. Stafford's generally satisfactory evaluation report on Mrs. Bruhwiler, is that Dr. Sickels got fired.

One wonders what Wayne Sickels would think of the court's finding that Dr. Stafford's attitude was "overtly sexist." Or

Dr. Sickels' male successor, who was also fired by Dr. Stafford. Or Ms. Paulette Sutton, who was given the highest evaluation of anyone in the laboratory in 1982, the same year in which Sallee Bruhwiler and Frida Saharovici got embroiled in what Ms. Sutton described as a "very, very loud commotion" that reduced Mrs. Saharovici to tears.

The district court was deeply distressed at Dr. Stafford's asking Mrs. Saharovici to leave the university without, as far as Mrs. Saharovici could remember, explaining why. That distress may be understandable, but the fact remains that neither Mrs. Saharovici nor anyone else suggested that she had been a victim of sex discrimination. Mrs. Saharovici testified that Dr. Stafford never mistreated her in any way after Mrs. Bruhwiler left, nor had he ever done so before the incident in question. In November of 1982—after Mrs. Bruhwiler's September 3 resignation—Dr. Stafford signed a memorandum reading as follows:

> "I request that Mrs. Saharovici's last evaluation be changed from "less than satisfactory" to "satisfactory." Her performance over the past several months has improved quite nicely, and we are not experiencing the kinds of instrument problems previously encountered. In addition, her attitude has improved dramatically since early September.
>
> I therefore recommend and request that her performance rating be changed to satisfactory and that her salary be adjusted appropriately."

More than three years later Mrs. Saharovici testified that she hadn't had any more problems, had received no more bad evaluations, had been given average pay increases, and—unlike Dr. Wayne Sickels and his male successor—she was still employed in the laboratory. Mrs. Saharovici was asked if the atmosphere in the lab had changed when Mrs. Bruhwiler left, but the court sustained an objection to this; the question—which I should have thought a pertinent one—went unanswered. At least we know that there were no further "loud commotions" between Mrs. Saharovici and Mrs. Bruhwiler.

Finally, the district court concluded that the promotion of the three male employees was a "ruse" to increase their salaries. But each of the three males had previously been asked to work "for free,"—*i.e.*, to work for some months in a higher job category without higher pay—just as Ms. Fowler, Ms. Sutton and Mrs. Bruhwiler had been. Dr. Stafford may have had much to answer for, but the charge that he discriminated against Mrs. Bruhwiler because of her sex simply was not proven, in my opinion. Based on the record as a whole, I think the court's finding of a statutory violation was clearly erroneous.