**Albert J. SCOTT, Plaintiff–Appellant,**

v.

**The GOODYEAR TIRE & RUBBER COMPANY, Defendant–Appellee.**

No. 96–3829.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 10, 1997.

Decided Nov. 20, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 11, 1999.*

* Judge Norris would grant rehearing for the reasons stated in his dissent.

Joseph W. Diemert, Jr. (argued), Laura J. Gentilcore (briefed), Joseph W. Diemert, Jr. & Associates, Cleveland, Ohio, for Plaintiff–Appellant. David L. Drechsler (argued and briefed), Mark J. Skakun (briefed), Buckingham, Doolittle & Burroughs, Akron, Ohio, for Defendant–Appellee.

Before: MERRITT, JONES, and NORRIS, Circuit Judges.

NATHANIEL R. JONES, J., delivered the opinion of the court, in which MERRITT, J., joined. ALAN E. NORRIS, J. (pp. 1130–1131), delivered a separate dissenting opinion.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Plaintiff Albert J. Scott appeals the grant of summary judgment in favor of Defendant Goodyear Tire and Rubber Company ("Goodyear") in this age discrimination case brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* and Ohio's counterpart statute.[1] Specifically, Scott contends that Goodyear constructively discharged him when it eliminated his position following company restructuring and offered him early retirement instead of redeployment[2] to a comparable position within the company. Upon consideration of the record and applicable law, we **REVERSE** the grant of summary judgment and **REMAND** for proceedings consistent with this opinion.

### I.

Albert Scott began his employment with Goodyear on June 6, 1952 and continued working for the company until December 1993—the date of his decision to retire. During his 41 years of uninterrupted service to Goodyear, Scott held many positions including stockman, gas man, general service man, delivery and sales person of Tires, Batteries and Accessories, credit sales manager, store manager, retail store operations representative, division inventory coordinator and, finally, Operations Manager. Scott received satisfactory reviews throughout his employment with Goodyear.

In his final position as Operations Manager, Scott bore responsibility for administering, implementing, and coordinating policy and procedures dictated by the company to its eastern region district managers and retail stores. Although Goodyear centered its operations managers within its headquarters in Akron, Ohio, Scott's duties sometimes required him to travel to store locations to handle administrative matters directly with store managers.

In May of 1993, Goodyear began a comprehensive restructuring of its upper-level management structure, which resulted in the elimination of the five Operations Manager positions maintained by the company, including the position held by Scott.[3] The other four positions were held by John Cox (63 years old), Rodney Gwinn (51 years old), Greg Wahrle (35 years old) and Shayon Smith (32 years old). Scott, who was 61 years old when his position was eliminated, was told that he had not been redeployed because others could better meet the experience, skill, educational and other characteristic needs of the company. Redeployed employees, as Gordon Hewitt, a Goodyear executive described it, would need, among other things, a "high energy level."

With the elimination of the operations manager position, Goodyear created the new position of Retail Administrator. Where, according to Goodyear management, the former position had fed the "heavily paperwork oriented system" and bred "inefficiency between Akron and the regions" (J.A. at 941–42), Goodyear intended the new position to help improve management efficiency and customer relations. Under the new structure, the retail administrator position demanded a familiarity with computer technology, as the prevailing paper-based data recording system had become a major source of inefficiency.

Sometime around early December 1993, Ken Gable and Rob Morris, both subordinates of Goodyear's Manager of Human Resources Paul Evert, were instructed by Evert to travel to Cleveland, Ohio and inform Scott that his position had been eliminated. Evert also requested that Gable cover the

---

1. Although Scott brought his claim under section 4101.17, the Ohio age discrimination statute has since been recodified at Ohio Rev.Code Ann. § 4112.14 (Anderson 1988).

2. "Redeployment" and its derivatives are the parties' choice terms for "reassignment."

3. The company only maintained five operations manager positions. Each operations manager took responsibility for a particular region of Goodyear's national business.

options available to Scott in the wake of his job loss. According to Gable's deposition testimony, he inquired into the decision to eliminate Scott's position, but was "advised that the decision had been made and that [informing Scott of the elimination and decision not to redeploy him] was [his] assignment and that [Evert] was not going to discuss how the decision was arrived at [sic]." J.A. at 496–97. With Evert having closed off that discussion, Gable and Morris traveled to Cleveland the next day, and informed Scott that his job had been eliminated. Scott questioned Gable about the reasons for the decision, and Gable responded that he was not in a position to tell him because he did not know.

Gable then presented Scott with three options in lieu of continuing on as an operations manager. First, Scott could accept layoff status and receive no benefits at all and no possibility of recall. Second, Scott could accept layoff status, receive supplemental unemployment compensation benefits on a regular basis and remain under consideration for recall to a new position, if such a position became available at a later date.[4] Finally, Scott could opt for retirement and receive a lump sum payment of $114,500.86, as well as monthly retirement checks and continued health benefits into retirement. Scott ultimately chose retirement.

As it turns out, some of the other former operations managers were retained and redeployed within the company. Shayon Smith was redeployed into a newly created retail administrator position based on his ability to "look at the overall process and then to get other people to cooperate with him that were not his peers" and his electronics background (J.A. at 677–78), as was Greg Wahrle, because his "programming skills" and his "team player" approach were highly rated among executives. J.A. at 662, 677. Rodney Gwinn

accepted a district manager position in Phoenix. Goodyear officials stated in deposition testimony that Gwinn's previous experience as a district manager made him a natural fit for the Phoenix position. J.A. at 676, 991. Thus, of the five former operations managers, only Scott and John Cox, the two oldest managers, were not offered definite redeployment opportunities within the company.[5]

After his retirement, Scott brought this age discrimination action under the ADEA and a corresponding Ohio anti-discrimination statute on May 12, 1995, alleging that Goodyear's decision to eliminate his position was impermissibly motivated by age considerations. During the subsequent discovery phase, Scott compiled a number of suspicious facts. First, as noted above, he uncovered the irregular manner with which the decision to eliminate his position was handled. According to the undisputed deposition testimony of Evert and Gable, the latter was instructed to inform Scott of the elimination of his operations manager position without asking further questions. Consequently, Gable entered the discussion with Scott unable to answer questions about why the company had decided not to redeploy him. According to Gable, this occurrence deviated from normal practice, since he, as human resources representative, was generally given latitude to inquire into the basis for a given employment decision and to assess for the adversely-treated worker his or her prospects for future employment with the company. On occasion, in fact, Gable was given permission to find other employment within the company for a dismissed employee.

In addition to the unusually vague response given to Scott, various statements of two of the three managers responsible for the decision to eliminate Scott's position indicated age bias. According to Edward Ercegovich,[6] a Goodyear employee at the time of

---

4. Under this second option, Scott risked losing medical benefits after 18 months of taking layoff status.

5. The operations manager positions were not the only positions eliminated as a result of the corporate reorganization. In all, forty-eight positions were eliminated as part of this restructuring, including regional secretaries, operations staff persons, administrative managers and district administrators.

6. Ercegovich himself brought a substantively identical age discrimination suit against Goodyear after Goodyear eliminated his position and failed to redeploy him. We reversed the district court's grant of summary judgment to Goodyear because we found that material issues of fact existed as to whether Ercegovich was denied a transfer because of his age. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998).

the reorganization, Ed Gallagher, who was then Vice President of the Retail Sales Division, made statements in 1993 such as "this company is run by white haired old men, waiting to retire" and "this must change." Ercegovich similarly attested that he heard Hewitt state in August 1995 in reference to Goodyear's upcoming Budget planning: "Some people will lose their jobs, but in time, we will replace them with young college graduates at less money." [7] Further, Scott presented deposition testimony from two of the three redeployed operations managers, Shayon Smith and Greg Wahrle, indicating that they had not been told that they were being laid off. J.A. at 440, 1037–38. Finally, Scott presented statistical evidence showing the average age of eliminated employees at 47.35 years old and that of non-eliminated employees at 40.47 years old. In reviewing these statistical findings, Drs. Harvey Rosen and John Burke, both economists, performed a chi-square test [8] to determine whether the age of an employee was a non-factor in determining whether his or her position was eliminated. After conducting further statistical analysis using a chi-square testing model, the economists concluded that the "data margin-ally *fail to reject* the null hypothesis that employee age is insignificant in explaining whether or not an employee's position was eliminated." J.A. at 184.

Prior to trial, however, Goodyear submitted a summary judgment motion on May 3, 1996, which the district court granted. Inexplicably, in the face of the economist's conclusions, the district court stated that no evidence supported Scott's contention that Goodyear managers forced him into retirement due to his age and thereby created an actionable instance of discrimination. Further, the district concluded that, even if Scott had raised a genuine factual question regarding a constructive discharge theory, he failed to provide additional evidence to support an inference that age-related bias motivated the adverse redeployment decision. Moreover, the district court determined that Scott failed to establish a prima facie case of age discrimination because he voluntarily accepted early retirement. Scott then filed this timely appeal.

## II.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

---

7. The affidavit states in full substantive part:

Edward E. Ercegovich, after being duly sworn, according to law deposes and states that he is of legal age, sound mind, and has personal knowledge of the following:

1. That he was employed by the Goodyear Tire and Rubber Company in its Retail Stores Division from February 7, 1962, until October 28, 1994;

2. That from or about January, 1992, through the end of his employment with Goodyear he served as Quality Systems Coordinator;

3. That while functioning in that position in or about late 1993, he had the opportunity to hear and did hear Edward Gallagher, then Vice President of the Retail Stores Division, substantively state in a meeting on the seventh floor that "This company is being run by white haired old men, waiting to retire", and "This must change"; and

4. That while still functioning in the same position with the Retail Stores Division in or about August 25, 1995, I heard Gordon Hewitt, Director of Finance for the Retail Stores Division, substantively state in his 1995 Budget/Business Plan presentation to the group that "Some people will lose their jobs, but in time, we will replace them with young college graduates at less money."

J.A. at 202. While Ercegovich's affidavit seems in order, we note that Scott, in his brief, also attributes quotes to Hewitt through deposition testimony of Gable to the effect that Goodyear "needs to hire younger men." However, a closer look at the deposition in question suggests that Gable was actually quoting former Goodyear Executive Mel Morrison, not Hewitt. See J.A. at 549. Morrison left Goodyear in 1990, several years before the relevant temporal period regarding Goodyear's allegedly discriminatory acts. Hence, we have serious doubts of any probative value that the quotes from the Gable deposition may have in this case.

8. In *King v. General Electric Co.*, 960 F.2d 617 (7th Cir.1992), the Seventh Circuit explained:

A chi-square test evaluates the disparity between the expected and observed frequency of a certain outcome. For example, suppose that of the individuals terminated at a given time, a greater percentage of them are within the protected age class. We want to determine whether the disparity in termination rates can be attributed to chance, or whether the disparity is so large, that some factor other than chance probably influence[s] the selection of the individuals terminated.... A[c]hi-square test will determine whether the chance or other factors influenced the outcome.

*Id.* at 626 n. 5 (citing Walter Connolly, Jr. et al. *Use of Statistics in Employment Opportunity Litigation* § 10.05[2] (1991)).

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This court exercises *de novo* review of a grant of summary judgment below. *Carpenter v. Western Credit Union,* 62 F.3d 143, 144 (6th Cir.1995).

Under the ADEA, a plaintiff is typically required to proffer evidence of the following to make out a prima facie case of age discrimination: (1) that plaintiff was between 40 and 65 years old; (2) that he was qualified for the particular position; (3) that he was subjected to adverse employment action; and (4) that he was replaced by a younger individual. *See Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1390 (6th Cir. 1993); *accord Woythal v. Tex–Tenn Corp.,* 112 F.3d 243, 246 (6th Cir.1997); *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Once a prima facie case has been established, this court applies the shifting burden framework of *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to age discrimination cases as well. *See Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir.1994). Thus, upon presentation of a prima facie case, the defendant must submit a legitimate, nondiscriminatory reason motivated the adverse employment action. *See id.* at 1082; *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The plaintiff is then required to demonstrate that the reason proffered by the defendant was pretextual. *Manzer,* 29 F.3d at 1083; *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Goostree v. Tennessee,* 796 F.2d 854, 861–63 (6th Cir.1986). In the words of the Supreme Court, the pretext inquiry considers whether "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

 The district court found, and parties appear to concede, that the law applicable to work force reduction cases is appropriate here. In such cases, this court takes account of the fact that the employer may not replace the plaintiff with a single worker.

"Where, as here, there is a reduction in force, a plaintiff must either show that age was a factor in eliminating his position, or, where some employees are shifted to other positions, that he was qualified for another position, he was not given a new position, and that the decision not to place him in a new position was motivated by plaintiff's age." *Hawley v. Dresser Industries, Inc.,* 958 F.2d 720, 723 (6th Cir.1992). Consequently, the fourth prong of the prima facie age discrimination showing is supplanted by a requirement that the plaintiff proffer "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons." *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 (6th Cir.1990); *see, e.g., Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1023 (6th Cir.1993). For purposes of our review of the summary judgment grant below, this case turns on two issues: whether the actions taken against Scott by Goodyear can be construed as constructive termination and, if so, whether Scott has provided sufficient evidence of discriminatory intent regarding the alleged adverse actions to create a factual question on the pretext issue. We answer in the affirmative as to both issues.

### A.

The first two prima facie elements appear to be established on the record. There is no dispute that Scott was 61 years old at the time his position was eliminated. Further, Scott maintained satisfactory marks throughout his 41 years of employment with the company and presented deposition testimony indicating that he took advantage of company-provided career development computer training. Thus, in common with the district court, we find that sufficient evidence exists on record to indicate that Scott was qualified for his position as operations manager.

Turning to the third prong, Scott alleges two theories of adverse treatment by Goodyear. First, Scott claims that he was constructively terminated by Goodyear due to his age. Second, Scott claims that Goodyear management intentionally decided against redeploying him on the basis of his age. We discuss each theory in turn.

The discriminatory termination to which Scott alleges to have fallen victim must overcome a significant hurdle—the menu of options given to him at the time his position was eliminated, all of which involved either accepting lay-off status or retiring, and his ultimate decision to retire. Scott maintains that he was laid off by Goodyear, even though he accepted the retirement option. Given this circumstance, Scott cannot prevail on a theory of actual discharge but must rely on the constructive discharge doctrine. As Scott phrased the issue in his brief in opposition to summary judgment below, he alleges to have been "forced to accept a lay-off without the likelihood of recall at the expense of much-needed medical benefits[.]"

"The law in this circuit is clear that a constructive discharge exists if working conditions are such that a reasonable person in the plaintiff's shoes would feel compelled to resign." *Bruhwiler v. University of Tennessee*, 859 F.2d 419, 421 (6th Cir.1988) (citing *Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 752 (6th Cir.1985)). In the typical discriminatory constructive discharge case, the employer does not overtly seek a discontinuation in the employment relationship but the employee claims to be subjected to intolerable working conditions due to discriminatory behavior. *See, e.g., id.* at 420 (research toxicologist hired by University possessing more seniority than her male supervisors and paid much less than her less experienced male supervisors resigned after receiving an "unsatisfactory" evaluation and being given names of possible job contacts by a superior when she did not asked for them); *Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 751–52 (6th Cir.1985) (constructive discharge occurred where employee was required to train the person who would supervise her, refused an explanation for her demotion, and never was seriously considered for a supervisory position). However, in the instant case, Scott alleges that the offer of layoff with possible recall amounted to a choice between voluntary and involuntary retirement. According to Scott's view, Goodyear had no intention of recalling him had he accepted layoff status.

The district court addressed the constructive discharge issue by analyzing this court's decisions in *Ackerman v. Diamond Sham-rock Corp.*, 670 F.2d 66 (6th Cir.1982), and *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510 (6th Cir.1991), to find that the constructive discharge doctrine should not apply to this case:

> There is no evidence that Gable coerced Scott into accepting retirement. On the contrary, the record indicates that Gable fully explained Scott's available options. Although Scott contends that the "evidence is clear" that Goodyear never intended to recall him and that this rendered the layoff option illusory, there is no evidence to substantiate this allegation.

J.A. at 26. We disagree.

The *Ackerman* court considered an instance in which the plaintiff, Edward Ackerman, at age 59, was informed that his director of communications job was being eliminated in the wake of corporate reorganization. *Ackerman*, 670 F.2d at 68. Ackerman was offered an early retirement package which gave him "much more than the benefits to which he would be entitled if he were simply terminated." *Id.* Although the record conflicted over whether Ackerman consulted an attorney before signing the early retirement agreement, he testified that he signed the agreement "of his own free will, that he understood the terms of the agreement, and that his employer complied with the agreement." *Id.*

Finding no evidence of discriminatory intent, other than the conclusory allegations of Ackerman that he could "think of no reason for his discharge other than his age," we determined that Ackerman voluntarily signed the early retirement offer and thus was not constructively discharged. *Id.* at 69–70. The court determined that Ackerman had not upheld his prima facie burden. *Id.* at 70. *Ackerman*, therefore, stands for the proposition that a mere allegation that improper motives led an employer to offer early retirement benefits is insufficient to prove that the employee who accepted those benefits was constructively discharged.

In *Wilson*, this court considered whether the plaintiff in that case presented adequate evidence indicating that age considerations motivated the decision to (1) eliminate his position and (2) offer him a choice of a lesser

position or early retirement. The plaintiff in that case, Ival Wilson, had presented circumstantial evidence of illicit motivation on the part of Firestone management in its determination to offer Wilson early retirement benefits, which this court found unpersuasive. *Wilson*, 932 F.2d at 514. Wilson offered the following three facts to support his claim: (1) that management had referred to his 33 years of employment with the company in a memo written by a manager at the time Wilson's severance package was being developed; (2) a conversation with his immediate supervisor a few months prior to the decision to eliminate his position in which his immediate supervisor stated that he hoped that older employees would accept the new company-wide early retirement option so that younger workers would not be displaced and; (3) the personnel documents kept by Firestone that included the birthdates and years of service of its employees. *Id.* On this record, we concluded that an inference of discriminatory motivation in an adverse employment decision had not been proven. *Id.*

Additionally, the *Wilson* court determined that the plaintiff did not demonstrate that he was actually or constructively discharged. A key factor in the decision to find against discharge was that Firestone had offered Wilson "legitimate opportunities for continued employment." *Id.* at 515. Since Wilson had, among other choices, the option to replace any of three of his former subordinates or accept early retirement, the court found that he was not forced to resign from the company. *Id.*

*Wilson* and *Ackerman,* while similar to the facts of the instant case, both differ by the evidence presented by the plaintiff and, at least with respect to *Wilson*, on the facts surrounding the alleged discharge. In its reliance on these two cases, the district court overlooked some vitally important evidence submitted by Scott at the summary judgment phase indicating that the retirement decision was less than voluntary.

First, we note the odd directives given to Gable, the Goodyear Human Resources executive. Gable was informed by Paul Evert that the position held by Scott would be eliminated and was told to travel to the Cleveland field office to report that fact to Scott. Gable, who testified that he had participated in at least three corporate reorganizations with Goodyear, had informed other Goodyear employees of such job eliminations in the past and many times received instructions to offer such employees lower level positions in lieu of lay-off. However, in this case, it appears that Evert cut off any further discussion regarding the decision to eliminate Scott's position.

Additionally, Scott recalled in deposition testimony that Gable and Morris, the other Goodyear executive present at the meeting with Scott in Cleveland, used the term "laid off" to describe the elimination of his position. Consequently, when Scott attempted to query Gable about the reasons for the elimination of his position and the possibility of future employment, Gable could not provide any answers. While the record does not reflect whether Gable made a formal or informal practice of informing other persons subjected to job elimination of their likelihood of being recalled, his inability to address the reasons for the elimination and decision not to redeploy Scott seem substantial enough reason for Scott to entertain the subjective belief that he would not be recalled if he chose lay-off status. Further, it seems that Wahrle and Smith may not have been told that they were being "laid off," and, more significantly, both were redeployed.

Scott thus chose retirement having no definite prospect of continued employment with the company. Therefore, where ordinary charges of constructive discharge typically entail a decision on the part of the employee to resign in light of an intolerable working environment or some such allegation, Scott decided upon the option best suited to his needs with the understanding that he did not have the option of continued employment. For that reason, we find that the doctrine of constructive discharge applies in this case.

 In addition to the constructive termination theory, Scott charges that the decision not to redeploy him serves as an actionable basis for going forward with his case. We note that, while this court has never recognized a right to redeployment under the ADEA, a decision made by an employer to redeploy younger employees while not rede-

ploying older ones is a recognized form of adverse employment action. *Hawley,* 958 F.2d at 723 ("If plaintiff is to prevail, it must be on the basis that age was a factor in failing to place plaintiff in another position.")

■ Examining the pertinent facts, we first note that the two oldest operations managers, Scott, at age 61, and Cox, at age 63, were not redeployed by the company at the time those positions were eliminated. Further, Scott has presented statistical evidence suggesting that the average age of employees whose positions were eliminated (47.35 years old) was significantly higher than the average age of employees whose positions remained intact through the corporate restructuring (40.47 years old). The district court took exception to the probative value of these statistics because 66 employees included in the redeployed comparison group "were never considered for redeployment since their positions were not in jeopardy [and therefore] the presumption that the sample was representative of all candidates for redeployment is false." After reviewing the statistical findings, however, we conclude that the district court hastily cast them aside for the following reasons.

First, while the statistics were not as probative as they perhaps may have been, they do reveal some startling age comparisons between persons occupying positions that were eliminated and those unaffected by the reorganization. In addition to showing a nearly seven-year age disparity between the two groups, the statistical evidence, which was compiled by two economists, Drs. Harvey Rosen and John Burke, pointed to a less than 1% chance that the discrepancy arose due to randomness. Not only does this evidence increase the likelihood that the decisions to eliminate certain positions were based on age but it also makes more likely the possibility that age played a part in redeployment decisions.

■ Second, the district court, borrowing language from *Chappell v. GTE Products Corp.,* 803 F.2d 261, 268 n. 2 (6th Cir.1986), deemed the seemingly inculpatory comments attributed to Goodyear managers Gallagher and Hewitt as "too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination." However, it would seem that a statement that the company "is run by white haired old men, waiting to retire," and "[t]his must change," both of which are attributed to Gallagher, as well as a statement that those who lose their jobs through reorganization will be replaced with "young college graduates at less money," which was attributed to Hewitt, read in a light most favorable to Scott, would be deemed relevant and probative by the district court. Such statements may have been "abstract, irrelevant and prejudicial" had they been made well-after the operative events or some other such occurrence. But these statements appear to have been made in and around the time of the corporate reorganization. *See Ercegovich,* 154 F.3d at 355 (Neither of similar remarks attributed to Goodyear executives could "be fairly characterized as 'ambiguous' or 'abstract.'"). In addition, the statements are consistent with what took place—Cox and Scott, the two oldest operations managers were not redeployed. We thus agree with the *Ercegovich* panel that "[b]oth remarks on their face strongly suggest that the speaker harbors a bias against older workers." *Id.*

### B.

■ Having found Scott to have presented a prima facie case of discrimination, we turn to the question of whether "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. We find that a jury question pertains to this issue, as there is conflicting evidence on the record. On the one hand, Goodyear has proffered an ostensibly legitimate motive to reduce its management layers for greater efficiency. On the other hand, however, as has been indicated, statements indicating bias against older workers have been attributed to Goodyear managers Gallagher and Hewitt. Both managers played a role in the decision to eliminate the position held by Scott. Evert ordered Gable not to answer routine questions from Scott regarding his position's elimination. The two oldest operations managers, Scott and Cox, were not redeployed. Further the statistical evidence seems to suggest that age considerations factored into the job elimination decisions and,

by consequence, the redeployment determinations.

## III.

Because we find that Scott has presented sufficient evidence to support a prima facie case, we find that the district court ruling to the contrary should be reversed. Additionally, we further conclude that the district court had sufficient evidence of pretext to create a jury question on that issue. Accordingly, we **REVERSE** the district court's grant of summary judgment to Goodyear and **REMAND** this case for proceedings consistent with this opinion.

ALAN E. NORRIS, Circuit Judge, dissenting.

As this court has observed, "The ADEA only bars discrimination on account of age; it does not place on employers an affirmative obligation to retain older workers whenever a reduction in staff becomes necessary." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir.1991). Rather, when age discrimination is alleged in the context of a reduction in the work force, a plaintiff must come forward with "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990). In proving a case, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1082 (6th Cir.1994) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Because I do not believe that plaintiff has come forward with either circumstantial or statistical evidence sufficient to establish Goodyear's discriminatory intent, I respectfully dissent.

The majority bases its decision upon a statistical study submitted by plaintiff and comments by two Goodyear employees that imply age bias. The district court considered this evidence, but deemed it insufficient to support plaintiff's claim.

With respect to the statistical study, the majority concedes that "the statistics were not as probative as they perhaps may have been." The district court explained the study's shortcomings in these terms:

Plaintiff's statistical analysis compares the group of the eliminated employees with a group comprised both of non-eliminated employees and employees whose positions were *not* affected by the reorganization. As 66 of those employees included in the "redeployed" group were never considered for redeployment since their positions were not in jeopardy, the presumption that the sample was representative of all candidates for redeployment is false. Since Scott's prima facie case depends on the premise that age motivated Goodyear's redeployment decision, "appropriate statistical data" must be limited to the pool of employees eligible for reassignment.

Statistical evidence is notoriously susceptible to manipulation. Consequently, *Barnes* cautions us that the data relied upon must be gathered from an appropriate source in order to support an inference of discrimination. *Barnes*, 896 F.2d at 1466. Here, the reliability of the study is called into question because it included individuals outside the category of redeployed employees that plaintiff alleges received discriminatory treatment. In *Barnes*, we noted that it was proper to *exclude* from a statistical study individuals who were "apparently not considered in the restructuring," *id.* at 1467, which is precisely what the study now before us failed to do. In sum, the district court correctly concluded that the probative value of the statistical evidence offered by plaintiff is of such limited value that, standing alone, it cannot support an inference of age discrimination on the part of defendant.

The majority does not base its decision upon statistical evidence alone. It also relies upon statements contained in an affidavit submitted by Goodyear employee Edward Ercegovich. This affidavit attributes statements of age bias to Goodyear managers Gordon Hewitt and Ed Gallagher.

Ercegovich, who is currently pursuing his own age discrimination claim against Goodyear, states that he heard Gallagher make the statement about "white haired old men waiting to retire" and heard Hewitt state

that those who lose their jobs in the reorganization would be replaced by "young college graduates at less money."

In my view, these statements are the strongest evidence that plaintiff musters in support of his contention that Goodyear acted with discriminatory animus. However, standing alone, they are not enough to survive summary judgment. As the district court pointed out, Goodyear came forward with substantial rebuttal evidence that plaintiff was not as well-qualified as other candidates for the positions awarded during redeployment. For instance, plaintiff did not possess either recent field experience or computer programming skills, which were required for two of the available positions. Thus, even if we assume that the statements attributed to Gallagher and Hewitt were sufficient for plaintiff to establish a prima facie case, Goodyear has come forward with evidence that it used legitimate criteria in its decision making process.

Accordingly, I would affirm the district court's grant of summary judgment.