**D.J. MILLER & ASSOCIATES, INC. Plaintiff,**

v.

**OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES, et al, Defendants.**

**No. C2–00–804.**

United States District Court, S.D. Ohio, Eastern Division.

Sept. 18, 2000.

Darlene Eve Chavers, Larry Holliday James, Crabbe Brown Jones Potts & Schmidt, Columbus, OH, for plaintiff.

Michael R. Gladman, Ohio Attorney General–2, Business & Government, Regulation Section, Columbus, OH, for defendants.

### OPINION AND ORDER

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on the Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction filed on July 19, 2000. The Plaintiff, D.J. Miller and Associates, Inc., allege that the Defendant, Department of Administrative Services for the State of Ohio, violated Title VI, 42 U.S.C. § 2000e, when it terminated the Plaintiff's contract. For the following reasons, the Plaintiff's Motion for a Preliminary Injunction is **GRANTED.**

## II. PROCEDURAL HISTORY

On July 19, 2000, D.J. Miller and Associates, Inc. ("DJMA"), filed a Motion for a Temporary Restraining Order and Preliminary Injunction. This Court held a conference pursuant to Local Rule 65.1 on that date. At that time, the parties believed that they might be able to reach a resolution without litigation, but on July 25, 2000, the parties informed the Court that a resolution was not possible. The Court set this matter for a preliminary injunction hearing on August 8, 2000. On August 1, 2000, the Defendant filed a Motion to Dismiss and a Memorandum Contra. On August 7, 2000, the Plaintiff filed for Leave to File a Second Amended Complaint. On August 18, 2000, the Defendants filed a Supplemental Motion to Dismiss.

In response, on August 24, 2000, the Plaintiff filed a Memorandum Contra the Defendant's Supplemental Motion to Dismiss. In this Memorandum, the Plaintiff voluntarily dismissed, for want of this Court's jurisdiction, the following claims: Count I, breach of contract; Count II, 42 U.S.C. § 1981; Count III, 42 U.S.C. § 1983; and Count IV, Fourteenth Amendment. As a result, the sole remaining claim before the Court at the Preliminary Injunction hearing was an alleged violation of Title VI, 42 U.S.C. § 2000d.[1]

## III. FACTS

DJMA is a Georgia corporation whose President and sole shareholder, David Miller, is African–American. On April 24, 2000, DJMA entered into a contract with the State of Ohio, Department of Administrative Services ("DAS"), to conduct Phase I of a Predicate Study. The Plaintiff defines a "predicate study" as "an analysis conducted to determine whether there is disparity which may be attributed to race and/or gender between contracts actually awarded by governmental entities and the availability of qualified minority and female businesses."

After the written contract was executed, an employee of DJMA, Dr. J. Vincent Eagan, met with state personnel. Following the meeting, Dr. Eagan resigned his position with DJMA. DJMA attempted to contact Dr. Eagan but was unable to do so. On May 30, 2000, DJMA received a fax from the State requesting clarification of Dr. Eagan's employment status. The fax stated that if Dr. Eagan were not available, then DJMA was to provide the State with the resume and qualifications of a

---

**1.** In DJMA's Motion for Leave to File à Second Amended Complaint, the Plaintiff added two additional Defendants: Merelyn Bates–Mims and J. Vincent Eagan. This Court granted the Motion to File A Second Amended Complaint during the Preliminary Injunction Hearing on September 1, 2000. The Court notes that the Second Amended Complaint was not filed before the hearing, and therefore, was not served on Defendants Bates–Mims and Eagan. Dr. Eagan did not appear at the hearing. Defendant Bates–Mims, an employee of the State, filed an Answer on August 18, 2000, and appeared as a witness at the preliminary injunction hearing.

The Plaintiff, however, did not seek to amend its Motion for a Preliminary Injunction to include the new Defendants. The Court, therefore, will consider only the Title VI claim brought against the State in this Opinion and Order.

replacement candidate by June 2, 2000. The Request for Proposals ("RFP"), under which DJMA was retained, made specific provisions for the hiring of, and approval by the State of, replacement personnel:

**Replacement Personnel.** The quality and professional credentials of the people the Contractor submitted in its proposal to do the Work were material factors in the State's decision to enter into this Contract. Therefore, the Contractor will use all commercially reasonable efforts to ensure the continued availability of those people. Also, the Contractor will not remove those people from the Work without the prior, written consent of the State, except as provided below.

The Contractor may remove a person listed in the RFP from the Work if doing so is necessary for legal or disciplinary reasons, provided that the Contractor makes a reasonable effort to give the State 30 calendar days' prior, written notice of the removal.

The Contractor must have qualified replacement people available to replace any people listed by name in the RFP. When the removal of a listed person is permitted under this Section, or if a person becomes unavailable, the Contractor will submit the resumes for two replacement people for each person removed or who otherwise becomes unavailable. The Contractor will submit the two resumes, along with such other information as the State may reasonably request, within five business days after the decision to remove a person is made or the unavailability of a listed person becomes known to the Contractor.

The State will select one of the two proposed replacements or will reject both of them within ten business days after the Contractor has submitted the proposed replacements to the State. The State may reject the proposed replacements for any legal reason(s). Should the State reject both replacement candidates due to their failure to meet the minimum qualifications identified in the RFP, or should the Contrac-

tor fail to provide the notice required under this Section or fail to provide two qualified replacement candidates for each removed or unavailable person, the Contractor will be in default and the cure period for default specified elsewhere in this Contract will not apply. In the event of such a default, the State will have the right to terminate this Contract and to have the damages specified elsewhere in this Contract for termination due to default.

The State may determine that proposed replacement candidates meet the minimum qualifications of this Contract and still substantially reduce the value the State perceived it would receive through the work of the original individual(s) the Contractor proposed and on whose credentials the State decided to enter into this Contract. Therefore, the State will have the right to reject any candidate that the State determines will provide it with diminished value.

Should the State reject both proposed candidates for any legal reason other than their failure to meet the minimum qualifications identified in the RFP, then such rejection will be deemed a termination for convenience.

The State has an interest in providing a healthy and safe environment for its employees and guests at its facilities. The State also has an interest in ensuring, and right to ensure, that its operations are carried out in an efficient, professional, legal, and secure manner. The State, therefore, will have the right to require the Contractor to remove any individual doing any part of the Work if the State determines that any such individual has or may interfere with the State's interests identified above. In such a case, the request for removal will be treated as a case in which an individual providing services under this Contract has become unavailable, and the Contractor will follow the procedures identified above for replacing unavailable people. This provision applies to

people engaged by the contractor's subcontractors if they are listed as key people on the RFP.

On May 31, 2000, DJMA submitted the name and resume of Dr. Edward Davis as the replacement employee for Dr. Eagan. Dr. Davis holds a Ph.D., is the Dean of the School of Business at Clark–Atlanta University and has experience in conducting predicate studies. Dr. Davis had conducted sixteen such predicate studies in cities including Dallas, Houston, Memphis and Jacksonville, had acted as the principal investigator in forty-two of the sixty-four disparity studies DJMA had completed, and had developed and updated a methodology used by DJMA. Dr. Davis served as Dr. Eagan's mentor, training him in the methodology. DJMA provided the State with fifteen references regarding Dr. Davis.

According to the terms of the RFP, the Principal Researcher:

> [M]ust have a doctorate in economics or statistics from an accredited university and be able to apply statistical measurements and have served in this capacity on a disparity or availability study of similar size and scope. The Principal Researcher will be the principal point of contact and exercise responsibility for the overall conduct, day to day activities and timeliness of the study. *This individual must have served in this capacity on a similar disparity or availability study. Please provide a resume and at least three client references for the Principal Researcher on a project of similar size and scope in the past five (5) years.* Include the contact person, government entity, address, telephone number, and brief description of the project and responsibilities of that team member.

(emphasis added).

On June 1, 2000, by e-mail, DJMA sent DAS a Staffing Plan Matrix and indicated that "the new Matrix reflects a greater percentage of time devoted by DJMA personnel to the Ohio study...." In a June 1, 2000 letter, Dr. Bates–Mims sent an e-mail message to DAS personnel recommending that Dr. Davis's resume be rejected.

By e-mail dated June 2, 2000, Dr. Bates–Mims asked Dave Miller to "forward to me (3) client references for Dr. Davis and for both Ms. Harrington and Williams for their work on a project of similar size and scope in the past five (5) years." On June 7, 2000, by letter, Mr. Miller sent Dr. Bates–Mims the requested information. In the letter, Mr. Miller provided fifteen client references. In addition, Mr. Miller stated that Dr. Davis "served as the principal researcher for a disparity study for the City of San Diego (CA) within the past five years."

On June 9, 2000, the State rejected Dr. Davis and ordered DJMA to meet with Dr. Eagan in Columbus, Ohio, on June 13, 2000 to "facilitate mediation." Five days later, on June 14, 2000, the State faxed a letter notifying DJMA that "any arrangement with D.J. Miller and Associates and Dr. Eagan, other than D.J. Miller and Associates' original proposal of March 30, 2000, is unacceptable and not in the best interest of the state." On June 15, Mr. Miller responded by stating that "[w]e will, of course, honor the reversal of your direction to negotiate with J. Vincent Eagan regarding the proposal that he presented to you in the course of our meetings in Columbus on June 13." DJMA again requested that Dr. Davis serve as principal researcher, and stated that it would be willing to have Dr. Davis meet with the State. Dr. Davis's credentials were again highlighted by Mr. Miller. On June 20, 2000, Scott Johnson, Director of Administrative Services, notified DJMA by letter that the contract would be terminated immediately, stating that the Dr. Davis "does not meet the minimum qualifications of the contract," and that "the loss of Dr. Eagan substantially reduces the value the state would receive through his work experience and on whose credentials the state decided to enter into this contract."

On June 14, 2000, six days before formally terminating DJMA's contract, Dr.

Bates–Mims made the decision that she was going to offer the contact to National Economics Research Associates, Inc. ("NERA"), to conduct Phase I of the Predicate Study. NERA is a majority-owned business. Dr. Bates–Mims intended to select NERA as a sole-source contractor and was not going to solicit again bids for the contract. Dr. Bates–Mims did not have information about the composition of NERA's staffing matrix; neither had Dr. Bates–Mims checked NERA's references. Despite not ascertaining all of the information about NERA that was mandated by the RFP for a firm to qualify as a provider of service, Dr. Bates–Mims was prepared to go to the Controlling Board the week after July 19, 2000, with NERA as a replacement for DJMA. She "was going to get" to the qualifications of NERA for the study "down the road." Dr. Bates–Mims was planning to have NERA start work in August 2000.

The Predicate Study in this case is divided into three phases; this lawsuit relates to Phase I. The Plaintiff requests that this Court enjoin awarding any phase of the Predicate Study to any individual or entity. The Plaintiff further requests that this Court enjoin the awarding of any Phase of the Predicate Study contract to any other entity until the rights of DJMA have been determined in relation to Phase I of the study.

## IV. ANALYSIS

 The factors to be considered in issuing a preliminary injunction are: "(1) the likelihood of success on the merits; (2) the irreparable harm that could result if the injunction is not issued; (3) the impact on the public interest; and (4) the possibility of substantial harm to others." *Basi-*

computer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir.1992). All four elements need not be satisfied individually, rather each factor is to be weighed to make a determination based on the totality. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985); *see also Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1480 (6th Cir.1995). A preliminary injunction is an extraordinary remedy that should only be granted if the movant carries his or her burden of persuasion. *See Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir.1978).

### A. Likelihood of Success on the Merits

As previously discussed, the sole remaining claim against DAS is one brought under Title VI, 42 U.S.C. § 2000d.[2] The Court, therefore, will examine the likelihood of success on the merits of this claim to determine whether a preliminary injunction should issue.

Section 2000d provides: "[N]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Program or activity" is defined as:

[A]ll of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or

---

2. Defendant Bates–Mims was also added as a Defendant under the Plaintiff's Title VI claim, but the Plaintiff did not name Dr. Bates–Mims in its Motion for a Preliminary Injunction. The Court will therefore not consider Dr. Bates–Mims as a Defendant in this Opinion and Order. The Plaintiff's claim against Defendant Bates–Mims will be reserved for trial.

Assuming that Dr. Bates–Mims is a proper Defendant for the purposes of this Opinion

and Order, the Court notes that " '[t]he proper defendant in a Title VI case is an entity rather than an individual.' " *Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 95 F.Supp.2d 723, 741 (N.D.Ohio 2000) (quoting *Farmer v. Ramsay* 41 F.Supp.2d 587, 592 (D.Md.1999)). The Court therefore finds that the claim against Dr. Bates–Mims should be dismissed.

agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government.... 42 U.S.C. § 2000d–4a.

██ To establish a claim, under Title VI, a plaintiff must demonstrate that the "program or activity" receives federal financial assistance, *see Buchanan v. City of Bolivar,* 99 F.3d 1352, 1356 (6th Cir.1996), and that there is a nexus between the "program or activity" and the discriminatory conduct. *See David K. v. Lane,* 839 F.2d 1265, 1275–76 (7th Cir.1988). The plaintiff also must demonstrate intentional discrimination: that the decision was "motivated by race and that his race was a determining factor in the exclusion." *Id.*[3] The State does not enjoy Eleventh Amendment immunity for violations of Title VI. *See* 42 U.S.C. § 2000d–7(a)(1).

██ In its Supplemental Motion to Dismiss, the State responded that Title VI is inapplicable as the program itself does not receive federal funds. Instead, the Predicate Study is authorized by the Ohio Legislature and is financed through the General Fund. DJMA responds that following *Grimes v. Superior Home Health Care,* 929 F.Supp. 1088 (M.D.Tenn.1996), all *entities* receiving federal funds must comply with Title VI.

Title VI prohibits discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Section 2000d–4(a) defines program or activity as "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government ... [or the State or local government] to which the assistance is extended...." 42 U.S.C. § 2000d–4(a). The plain language of the statute, which broadly defines "program or activity," indicates that "all of the operations" are included, and that the State "to which assistance is extended" is also included. Based on the statutory language, the Court concludes that it is not necessary to find that the Predicate Study itself is federally funded, so long as the agency or instrumentality of the State is federally funded. The court in *Grimes,* addressing this precise issue found:

> The landscape of Title VI changed in 1988, however, when Congress enacted the Civil Rights Restoration Act of 1987 ("the 1987 Act"), which overturned the program-specific interpretation.... The 1987 Act expanded the concept of "program or activity" by adding to Title VI and other anti-discrimination statutes ... an explicit definition of that phrase. [citations omitted]
>
> 'The new definition specifies that entire entities receiving federal funds—whether governmental entities, school systems, or universities—must comply with Title VI, rather than just the particular program or activity that actually receives the funds.'

*Id.* at 1091–92.

In this case, the Court agrees with the reasoning of *Grimes* and finds that the Predicate Study itself need not be federally funded to bring the Defendant within the purview of Title VI, as DAS and/or the State receives federal funds.

Having satisfied the second part of § 2000d, that the Defendant receives federal funds, the Court next must determine whether DJMA was, on the "ground of race, ... excluded from participation in, [ ] denied the benefits of, or [ ] subjected to discrimination...." 42 U.S.C. § 2000d. To reach this question, the Court must look to determine whether DJMA demonstrated intentional discrimination; specifically, whether DAS's decision was "motivated by race and that [ ] race was a determining factor in the exclusion." *David K. v. Lane,* 839 F.2d 1265, 1275–76 (7th Cir.1988).

---

**3.** A plaintiff may bring a disparate impact claim under Title VI. *See Buchanan,* 99 F.3d at 1356 n. 5. In this case, however, the Plaintiff has not proceeded under a disparate impact theory.

In analyzing this issue, the Court relies upon the reasoning in *Kline v. Tennessee Valley Authority*, 128 F.3d 337 (6th Cir. 1997), where the court found in a Title VII, 42 U.S.C. § 2000e, case that " '[d]irect evidence of intentional discrimination is hard to come by.' " *Id.* at 348 (citations omitted). Although Title VII relates to discrimination in employment, the same concerns are present in a Title VI claim as "[i]t is the rare situation when direct evidence of discrimination is readily available, thus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof." *Id.* The *Kline* court continued: "[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Id.*

■ In *Lerner v. Ravenswood Hospital Medical Center*, No. 98–C–5369, 1999 WL 1267710, *6, 1999 U.S. Dist. LEXIS 19804, at *12–*13 (N.D.Ill. Nov. 10, 1999), the court applied the Title VII burden-shifting analysis to the plaintiff's Title VI claim. *See also Hankins v. Temple Univ.*, 829 F.2d 437 (3d Cir.1987) (same). This Court will follow *Lerner* and *Hankins* and will implement Title VII's burden-shifting framework to analyze DJMA's Title VI claim.

Without direct evidence, to establish a prima facie case of race discrimination under Title VII, a plaintiff must establish: (1) he was a member of a protected class, (2) he suffered an adverse action, (3) that he was qualified for the position, and (4) that he was replaced by someone outside the protected class, or that he was treated differently than similarly-situated non-minority entities. *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728–29 (6th Cir.1999); *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1166 (6th Cir.1996); *Harrison v. Metropolitan Gov't of Nashville & Davidson Cty.*, 80 F.3d 1107, 1115 (6th Cir.1996).

Once the plaintiff establishes a prima facie case, the defendant must come forward with a legitimate non-discriminatory reason for the adverse action. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir.1998); *Thurman*, 90 F.3d at 1166; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992). The defendant need not show that the decision was motivated by the proffered reason, only that the non-discriminatory reason is legally sufficient to justify a judgment for the defendant. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089. If the defendant proffers a sufficient non-discriminatory reason, then the presumption created by the prima facie case is rebutted. *Id.* at 255, 101 S.Ct. 1089. Once the defendant provides a legitimate non-discriminatory reason for the adverse employment action, the plaintiff must demonstrate that the employer's proffered reasons were but a pretext for unlawful discrimination. *Scott*, 160 F.3d at 1126; *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994).

■ As a threshold consideration, DJMA, a minority-owned business, is a member of a protected class. The sole shareholder and President of DJMA is African–American. Second, DJMA suffered an adverse action when its contract to conduct Phase I of the Predicate Study was terminated by the State on June 20, 2000. Third, on the element of qualification, in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir.2000), the Sixth Circuit held that it is "[i]nappropriate for the district court in the pre-trial stage to rely on the nondiscriminatory reason for termination to find plaintiff's prima facie case inadequate." The court continued, "[i]n other words, when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the

nondiscriminatory reason for terminating the plaintiff." *Id. Cline* reasoned that whether the plaintiff was terminated because she was not qualified, or because she was a member of a protected class, goes to the ultimate question in the case. *Id.* at 665. Based on *Cline*, this Court finds that DJMA adequately showed that it was qualified to conduct the Ohio predicate study.[4] DAS's initial award of the contract to DJMA demonstrates that the company was qualified for the position. Furthermore, DJMA has conducted sixty-four such disparity studies since 1986.

Finally, DJMA was treated differently than a similarly-situated non-minority company, NERA. DAS was soliciting the business of NERA, a majority company, to complete Phase I of the Predicate Study before this suit was filed by DJMA and without having subjected NERA to the same scrutiny under the RFP. Dr. Bates–Mims said that she was prepared to go to the Controlling Board with NERA as a replacement for the Contract the week after July 19, 2000, and that she "was going to get" to the qualifications of NERA for the study "down the road." Moreover, Dr. Bates–Mims was going to request the Controlling Board to allow DAS to contract with NERA as a sole source without engaging in the competitive bid process prescribed by the RFP. Dr. Bates–Mims testified that on June 14, 2000, six days before terminating DJMA's contract, DAS made the decision that it was going to contract with NERA.

The Court record shows that unlike DJMA, NERA was not required to submit a RFP; was not required to go through the interview process; was not required to submit the qualifications of its principal researcher, including that he or she had

conducted three predicate studies of similar size and scope in the last five years; and was not required to submit a staffing matrix before being presented to the Controlling Board. Based on this, the Court finds that the fourth prong of the Plaintiff's prima facie case has been met.

In response, DAS provided as its legitimate, non-discriminatory reason for terminating DJMA's contract the fact that DJMA's Primary Researcher, Dr. Eagan, left DJMA's employ and the proposed replacement, Dr. Davis, was not qualified for the position.[5] The State contends that Dr. Davis did not meet the minimum criteria of the RFP for two reasons: first, Dr. Davis only would be able to dedicate 60% of his time to the project while Dr. Eagan stated he would dedicate 81%; and second, because Dr. Davis did not serve as the Principal Researcher in three predicate studies of "similar size and scope" during the past five years.

The "minimum qualifications" for the Primary Researcher include that he or she:

[M]ust have a doctorate in economics or statistics from an accredited university and be able to apply statistical measurements and have served in this capacity *on a disparity or availability study of similar size and scope.* The Principal Researcher will be the principal point of contact and exercise responsibility for the overall conduct, day to day activities and timeliness of the study. *This individual must have served in this capacity on a similar disparity or availability study. Please provide a resume and at least three client reference for the Principal Researcher on a project of similar size and scope in the past five (5) years.*

---

4. This Court will reserve analysis of DAS's contention that DJMA was not qualified, for the second and third phases of the *McDonnell Douglas* analysis.

5. Dr. Eagan had the following qualifications: a Ph.D. in Economics from Georgia State University and a J.D. from Harvard Law School; experience in serving as an expert

witness; ability to devote 81% of his time as the principal point of contact for day-to-day activities; and participation in twelve studies that DJMA had done in the past five years. Dr. Eagan participated in studies in Florida, Memphis and Shelby County in Tennessee, and a study for the United States Department of Commerce that included seventy-five cities.

Include the contact person, government entity, address, telephone number, and brief description of the project and responsibilities of that team member.

(emphases added).

In response, DJMA states that DAS's reasons were but a pretext for unlawful discrimination. First, DJMA notes that during a steering committee meeting, held on December 8, 1999, Dr. Bates–Mims stated that after reading *Associated General Contractors of Ohio v. Drabik*, 50 F.Supp.2d 741 (S.D.Ohio 1999) (Graham, J.), she concluded that the firm selected to do the predicate study should not be an "advocacy group." DJMA builds on this assertion with the testimony of James W. Barrett, a member of the Cleveland Business League, and Ike Jenkins of Jenkins Construction, both of whom also attended the steering committee meeting. Both Messrs. Barrett and Jenkins testified that it was their understanding at the meeting that "advocacy group" necessarily meant black-owned business. On questioning from the Court during the hearing, however, Dr. Bates–Mims specifically stated that in her opinion, DJMA was not an advocacy group. Dr. Bates–Mims distinguished businesses from advocacy groups and noted that she did not consider any of the consulting businesses that applied for the RFP to be advocacy groups.

The Court finds that the Plaintiff's argument, that Dr. Bates–Mims would not consider a minority-owned business for the contract because it would be considered to be an advocacy group, to be a red herring for several reasons. First, two majority and two minority firms were initially considered for Phase I of the Predicate Study, and a minority firm was initially chosen. Second, Dr. Bates–Mims testified that neither DJMA nor NERA were, in her mind, advocacy groups; rather, the two firms were businesses. There was no testimony or any other evidence or record indicating

that either Dr. Bates–Mims or DAS thought DJMA to be an advocacy group.

At the hearing, Dr. Bates–Mims further testified that Dr. Davis had not participated in three studies in the past five years that were of similar size and scope, and that therefore he was not qualified to be the primary researcher. Dr. Bates–Mims stated that DJMA only provided her with one study, that of San Diego, California, where Dr. Davis had served as a primary researcher in the past five years. In addition, Dr. Bates–Mims stated that Dr. Davis was not qualified because his day-to-day contact with DAS was 21% less than that of Dr. Eagan.[6]

The evidence that was presented by DJMA to rebut DAS's asserted legitimate non-discriminatory reason for the adverse action, however, is compelling. DJMA argued that Dr. Davis was qualified for the position and met all of the RFP's criteria to be the primary researcher. The Court agrees. The Court finds that DAS's reasons for terminating DJMA's contract were but a pretext for unlawful discrimination. The language of the RFP is salient and unequivocal: the RFP only requires that the principal researcher conduct **one** predicate study within the past five years. The specific language of the RFP provides that the Principal Researcher:

[M]ust have a doctorate in economics or statistics from an accredited university and be able to apply statistical measurements and *have served in this capacity on a disparity or availability study of similar size and scope*. The Principal Researcher will be the principal point of contact and exercise responsibility for the overall conduct, day to day activities and timeliness of the study. *This individual must have served in this capacity on a similar disparity or availability study. Please provide a resume and at least three client references for the Principal Researcher on a project of similar*

---

**6.** The Court notes that Dr. Bates–Mims mathematical conclusion is not technically correct. By dedicating 60% of his time, Dr. Davis would in actuality be contributing 25.93% less time to the predicate study than would have Dr. Eagan.

*size and scope in the past five (5) years.* Include the contact person, government entity, address, telephone number, and brief description of the project and responsibilities of that team member.

(emphases added).

DAS argued for two days that Dr. Davis did not meet this requirement because he did not serve as the principal researcher in three predicate studies in the past five years. DAS's argument is specious and without any basis. There is no requirement in the contract for the principal researcher to have completed three predicate studies within the past five years. The contract requirement is only one study, which Dr. Davis clearly satisfied.

It appears that DAS engrafted this requirement onto the contract to preclude either Dr. Davis, DJMA or both from performing Phase I of the Predicate Study. And it is clear under *Kline* that this Court, in the absence of any logical, non-discriminatory explanation-which has not been offered in this case-can infer discriminatory intent. This Court does infer such intent based upon the record before it.

The Court finds that Dr. Bates–Mims's testimony, that DJMA's contract was terminated because Dr. Davis had not participated in three studies in the past five years that were of similar size and scope, was but a pretext for unlawful racial discrimination.

Even if this Court were to read the language of the RFP as the Defendants did, Dr. Davis would have been a qualified replacement candidate. Dr. Davis was the primary researcher on three predicate studies in the past five years: City of San Diego DEGA/TMS disparity study (1995); City of San Diego statistical update (1998); and Atlanta Public Schools procurement study update (1997). Dr. Davis's testimo-ny was not refuted; that is, that "the term predicate study, disparity study, are synonymous." Dr. Davis further testified "I think the procurement study that I did for the public school system was a disparity study around just procurement and so I called it procurement study and didn't look at the total contract." Even viewing the contract language as DAS did, the Court finds that Dr. Davis met the requirements of the RFP.

Moreover, Dr. Davis satisfied all other criteria. It should be noted that the requirement of a "doctorate in economics or statistics" begins with the mandatory language of "must." DAS does not dispute the fact that Dr. Davis meets this initial requirement. Second, the principal researcher "will be the principal point of contact and exercise responsibility for the overall conduct, day to day activities and timeliness of the study." Again, DAS does not dispute that Dr. Davis meets this requirement. Next, again using mandatory language, the candidate "must have served in this capacity on a similar disparity or availability study." DAS does not dispute that Dr. Davis had served in this capacity, and his curriculum vitae bears out this conclusion. For example, DAS does not challenge the fact that Dr. Davis served as the principal researcher for the City of San Diego.

The RFP also requires that the firm provide a resume, three client references for a project of similar size and scope in the past five years and a brief description of "the project" (singular). The three references, according to the RFP, should have been on a project-not on three separate projects.[7] DJMA met this requirement when it provided as an attachment to its May 31, 2000 letter the curriculum vitae of Dr. Davis, and an additional June 7, 2000 letter with attached references.[8]

---

7. Dr. Bates–Mims's June 2, 2000 e-mail message to Dave Miller mirrors the language of the RFP. Dr. Bates–Mims wrote, "please forward to me (3) client references for Dr. Davis ... for [his] work on a project of similar size and scope in the past five (5) years." The e-mail request, again, does not require that Dr. Davis have worked on three projects, but that DJMA provide three references on a project.

8. It also should be noted that the language of this sentence does not use the word "must," in contrast to the other sentences in the description.

Next, the RFP states that DJMA was to "[i]nclude the contact person, government entity, address, telephone number, and brief description of the project and responsibilities of that team member." The Court finds that DJMA also met this requirement when it provided in a June 6, 2000 letter a staffing matrix, and in a June 7, 2000 letter from Dave Miller to Dr. Bates–Mims attached references naming the City of San Diego.

Finally, Dr. Bates–Mims testified that Dr. Davis was not an acceptable candidate as he was going to provide 60% of his time to the study, while Dr. Eagan was going to provide 81%. Again, the Court finds this reason to be pretext for unlawful discrimination. Dr. Eagan was going to be replaced not only by Dr. Davis, but in addition, Melanie Harrington, J.D., and Sherry Williams, J.D., were added to the matrix.[9] The exchange of three for one can hardly be found to be "diminished value."[10] Dr. Bates–Mims further concluded that Dr. Davis would spend less time on the study than Dr. Eagan would have; however, Dr. Bates–Mims refused to meet with Dr. Davis to ask if this were true, to determine Dr. Eagan's on-going time commitments or to confirm her conclusion. In addition, there was unrefuted testimony that the RFP set a percentage of the total fixed price permitted to be spent during a given period of time.[11] Neither Dr. Davis nor Dr. Eagan could have put more time in than what was permitted by the budget. The Court finds that Dr. Bates–Mims's

second reason for not accepting Dr. Davis as a replacement primary researcher is but pretext.

Based on the Plaintiff having established a prima facie case of race discrimination, and on the Plaintiff's rebutting of the Defendant's proffered non-discriminatory reason, the Court finds that there is a high likelihood of success on the merits on the Plaintiff's claim of discrimination under Title VI.

### B. Irreparable Harm

The second element is whether irreparable injury would result from a preliminary injunction not being issued. "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp.*, 973 F.2d at 512 (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)).

DJMA argues that the predicate study business is a small niche field, and that losing this contract would cause it to suffer irreparably from a loss of goodwill and from a loss of its "good name." DJMA pointed to several inquiries about the loss of the Ohio contract that it has received from cities where DJMA is either conducting on-going studies or is in negotiations to conduct a study. Specifically, Mr. Miller testified that Tallahassee, Florida; Birmingham, Alabama; Cleveland, Ohio; the State of Florida and International Aviation Consultants have all contacted DJMA to

---

9. Ms. Harrington played a senior role on eight disparity studies including those for the Broward County Schools, the Orange County Consortium and the City of Tampa. In addition, Ms. Harrington was the Project Manager on six other disparity studies including the State of Florida and the City of Evanston, Illinois. Ms. Williams was the project manager in three disparity studies and served as an expert witness for Shelby County and Memphis City Schools.

10. Dr. Eagan likely would have given 81% of his time as both a statistician and as a lawyer. Dr. Davis, in contrast, was not a lawyer and likely would have dedicated all 60% of his time to conducting the statistical portions of

the study. Ms. Williams and Ms. Harrington were added to the matrix, and both individuals were lawyers. Given this analysis, it is likely that Dr. Davis would have dedicated more, or the same amount of "actual time" to the statistical analysis portion of the study. Dr. Bates–Mims, however, never met with Dr. Davis to ascertain whether this was in fact the case.

11. Page 25 of the RFP sets a percentage of the total fixed price that is permitted to be submitted for reimbursement during a given contract period. Arguably, if Dr. Eagan would have spent 81% of a 40 hour work week on each segment of the study, the allotted "fixed price" would have been exceeded.

determine "what's going on here with the State of Ohio." Mr. Miller testified that, as a result of the State's actions, DJMA is losing business.

The Court finds that the Plaintiff has made a sufficient showing of irreparable harm. The Court accepts Mr. Miller's testimony that the contract being terminated by the State of Ohio will cause a loss of goodwill and will damage DJMA's "good name."

### C. Substantial Harm to Others

The third element is whether issuance of a preliminary injunction would cause substantial harm to others. DJMA contends that the potential harm to DJMA if the State awards the contract to another individual outweighs any delay that the State may experience while this Court makes its determination. The State, in turn, argues that issuance of a preliminary injunction would cripple the State's attempt to revive the Ohio Minority Business Enterprise law and would therefore harm minority-owned firms.

The Court finds that DJMA satisfies this prong of the test for the issuance of a preliminary injunction. The Court agrees that the harm suffered by the victim of discrimination will almost always outweigh the inconvenience to others-here, a delay in the completion of the predicate study visited upon the public. The right to be free from discrimination is such a core value of our society that a delay pales by comparison to the harm that discrimination occasions. Moreover, given the relief that the Court grants-reinstatement of the contract-the delay will be slight. On the basis of the Court's Order, the predicate study should resume forthwith.

The Court finds DAS's argument disingenuous. The purpose of Phase I of the Predicate Study is not to revive the Ohio Minority Business Enterprise law. Rather, the study is to be an objective analysis on the basis of which a determination can be made of whether the law should be revived and implemented or firmly interred. Thus, irrespective of which firm conducts the study, that firm is responsible for determining the viability of the law itself, in that it will determine whether there has in the past been some disparity in areas such as state contract procurement.

### D. Public Interest

The fourth element is whether the issuance of a preliminary injunction would impact the public interest.

DJMA argues that the public interest will be served if the State of Ohio uses the funds set aside for the predicate study appropriately and does not engage in bad faith dealings with its contractors. The State responds, and the Plaintiff admits, that the predicate study is of "utmost importance to public policy and legislative intent in the State of Ohio." The Defendant states that enjoining the Study would harm the public interest.

As set forth in subpart C, it is beyond responsible debate that the public interest is served when core societal values-in this case, a discrimination-free contracting process-are vindicated. The public similarly has an interest in state agencies honoring their contractual obligations. *See National Interstate Ins. Co. v. Perro*, 934 F.Supp. 883, 891 (N.D.Ohio 1996) (finding that "the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts."). As is true in all sectors of commerce, public and private, it is important that parties adhere to and abide by commercial agreements, as valid contracts are the lynchpin of all commercial activity in society.

The Court agrees with DAS as to the importance and exigency of the study. This Court's ruling does not, however, undermine the public policy concerns or the legislature's intent. The Court reiterates that it is enjoining unlawful termination, *not* the predicate study. The predicate study process, devoid of discrimination, is now unencumbered to move forward.

## V. CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for a Preliminary Injunction is **GRANTED.** The Defendant is **ORDERED** to reinstate its contract with D.J. Miller and Associates, Inc. to conduct Phase I of the Predicate Study, with Dr. Davis acting as the principal researcher.

**IT IS SO ORDERED.**